CARAWAY, J.
 

 11 Brian Garner was charged and convicted after a jury trial of second degree murder, in violation of La. R.S. 14:30.1, and received a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, with credit for time served and 30 days of imprisonment in the parish prison in lieu of court costs. Garner appealed his conviction and sentence. For the following reasons, we affirm his conviction and amend his sentence.
 

 Facts
 

 At approximately 11:00 p.m. on October 29, 2006, police responded to the scene of a shooting at 1815 Hickory Street in Shreveport, Louisiana, and discovered that the victim, Jacqueline Chatman, had been shot
 
 *586
 
 three times. Chatman later died as a result of her injuries.
 
 [1]
 

 Chatman had met Zosia Myles in 2005, while the two were incarcerated at Caddo Correctional Center. Chatman and Myles became friends in jail and continued their friendship when both were released. Myles was incarcerated for shooting her on-again, off-again boyfriend, the defendant, Brian Garner.
 

 Approximately three weeks before Chat-man’s murder, Myles agreed to purchase Chatman’s 1999 Ford Explorer for $500.00. A short time after the sale, Chat-man and her boyfriend flagged down Myles to ask her for a bride to a hotel. Myles agreed, on the condition that she drop her children and niece off at school beforehand. When Myles went into the school to drop off her niece, Chatman and her boyfriend drove off with Myles’s vehicle. Myles later went with her uncle to the home of Chatman’s sister, Lashunda Bright, to complain to her about the theft. Myles claimed to have been upset because she had left several personal documents (including birth certificates and social security cards), her purse, cell phone and $2,000.00 cash in the Ford Explorer.
 

 Myles informed Garner of the theft while he was in Dallas, Texas. Garner returned to Shreveport approximately one week later, and he and Myles resumed their relationship.
 

 On the night of Chatman’s murder, Myles and Garner were driving around in Garner’s sister’s car and stopped to get gas at a Chevron station in Shreveport. While Garner was pumping gas, Myles recognized what she believed to be her stolen vehicle at the station. Two men were sitting in the Ford vehicle at the time, and Myles approached them and asked where they had gotten the vehicle. The men told Myles that they had rented it from a “crackhead.” Myles searched the glove box and found documents confirming that it was the same vehicle she had bought from Chatman. Myles informed Garner of her discovery. Garner then went over to the truck, pulled out a gun and sat in the back seat of the Explorer behind the two men. He told Myles to follow them in his sister’s car. Myles followed the men to Hickory Street.
 

 | ¡¡Once at their destination, Myles, who believed she recognized Chatman standing in the front yard, called out her name. When her identity was confirmed, Myles approached Chatman and a physical altercation between the two ensued. Chatman fell to the ground as a result of the fight and Myles turned to walk away. As she did, she told Garner either to “shoot the bitch,” or “kill the bitch” (she could not recall which verb she used). Immediately thereafter a gun discharged and after a slight pause several more shots were heard. Garner then told Myles to get her truck and the two fled the scene to Garner’s aunt’s home. Both Garner and Myles changed clothes and Garner left the residence. As police processed the murder scene, they received a phone call about a Ford Explorer found burning. Police ultimately identified the vehicle as the one involved in the crime. Police also discovered six spent 9 mm shell casings at the crime scene.
 

 
 *587
 
 When making death notifications to Chatman’s family, police were informed of Myles’s anger at Chatman for stealing her vehicle. When witnesses to the crime identified Myles from a photographic lineup, police arrested Myles on November 6, 2006, for second degree murder. Upon Myles’s implication of Garner as Chat-man’s shooter, police arrested him in Dallas.
 

 After a trial, an 11-1 jury convicted Chatman as charged. Post verdict motions for judgment of acquittal and for a new trial were filed by the defense and denied by the court on September 25, 2009. On September 25, 2009, Garner waived sentencing delays and was sentenced to the mandatory life sentence without benefit of probation, parole, or suspension of sentence, |4to run concurrently with any other sentence Garner was required to serve and 80 days of imprisonment in the parish prison in lieu of court costs. This appeal ensued.
 

 Discussion
 

 Garner argues that the state failed to prove beyond a reasonable doubt that he killed Chatman based upon the lack of physical evidence, including a murder weapon, and the lack of eyewitness testimony, other than Myles, identifying him as the shooter. Garner argues that Myles lacked credibility due to her involvement in the crime.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 448 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 01-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Cummings,
 
 95-1377 (La.2/28/96), 668 So.2d 1132;
 
 State v. Murray,
 
 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488,
 
 writ denied,
 
 02-2634 (La.9/05/03), 852 So.2d 1020.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. When the conviction is based on circumstantial evidence, such evidence must exclude any reasonable hypothesis of innocence. La. R.S. 15:438. The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an | ¡^alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 State v. Calloway,
 
 07-2306 (La.1/21/09), 1 So.3d 417. When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.
 
 State v. Captville,
 
 448 So.2d 676, 680 (La.1984).
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Wiltcher,
 
 41,981 (La.App.2d Cir.5/9/07), 956 So.2d 769;
 
 State v. Burd,
 
 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219,
 
 writ denied,
 
 06-1083 (La.11/9/06), 941 So.2d 35. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant.
 
 State v. Robinson,
 
 36,147 (La.App.2d Cir.12/11/02), 833 So.2d 1207;
 
 State v. Ponsell,
 
 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678,
 
 writ denied,
 
 00-2726 (La.10/12/01), 799 So.2d 490.
 
 See
 
 also
 
 State v. Johnson,
 
 96-
 
 *588
 
 0950 (La.App. 4th Cir.8/20/97), 706 So.2d 468,
 
 writ denied,
 
 98-0617 (La.7/2/98), 724 So.2d 203,
 
 cert. denied,
 
 525 U.S. 1152, 119 S.Ct. 1054, 143 L.Ed.2d 60 (1999). The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 07-1209 (La.12/14/07), 970 So.2d 529.
 

 The crime of second degree murder is set forth in relevant part in La. R.S. 14:30.1 as follows:
 

 A. Second degree murder is the killing of a human being:
 

 (1) When the offender has a specific intent to kill or to inflict great bodily harm.
 

 Testifying for the state, Myles explained her relationship with Garner. The couple had three children together and had been in an intermittent relationship for the last 14 years. Garner’s threats of physical violence caused Myles to shoot him nine times in 2005. Myles met Chatman in 2005 while serving her sentence for the offense. Myles admitted her additional criminal history which dated to 1998, when she was charged with aggravated assault. In 2002, she pled guilty to misdemeanor theft.
 

 Myles admitted that in the present case she was originally charged with second degree murder but that she pled guilty to conspiracy to commit second degree murder and agreed to testify truthfully regarding the murder of Chatman. After testifying, she would receive a sentence of credit for time served of 2 years and 10 months.
 

 Myles testified about her purchase of the Ford Explorer from Chatman three weeks before the incident for $500, Chat-man’s subsequent theft of the truck, and her resentment toward Chatman following the theft. She also testified that she had resumed her relationship with Garner and told him about the theft.
 

 |7On the evening of October 29, 2006, Myles explained how she saw the Ford Explorer at the Chevron station and confirmed it was the same one she had bought from Chatman. She testified that Garner became very upset at this discovery and pulled out a gun before jumping into the back seat of the truck: In response to Garner’s command, Myles followed the Ford Explorer to Hickory Street, where she recognized Chatman standing in the front yard. Myles then physically attacked Chatman, leaving her on the ground. Myles admitted to walking away and telling Garner to either “shoot the bitch,” or “kill the bitch.” Immediately after, she heard a gunshot, followed by a short pause and then several other gunshots.
 

 Myles testified that although she did not actually see Garner shoot Chatman, she did not see anyone else at the crime scene with a gun. Garner told Myles to get the Explorer while he got into his sister’s vehicle and the two drove to Garner’s aunt’s house. The two changed clothes and Garner left without Myles. Myles noticed the next morning that the Ford Explorer was gone. She later learned that it had been burned.
 

 Myles and Garner broke off their relationship a few days after the murder, and Myles was arrested on November 9, 2006. She agreed to make a statement to police and was not promised any leniency or special treatment in exchange for it. Myles testified that the statement she gave to police on November 9 regarding the murder was the same as her previous trial testimony, with two exceptions. First, at
 
 *589
 
 the police station she had not told the police that she told Garner to either “shoot the bitch,” or “kill the bitch.” |s Second, there was some confusion when she talked to police about whether or not her children were present during the murder.
 

 In her testimony, Myles admitted certain contradictory accounts of the crime she had previously given. Myles signed an affidavit for police swearing that Garner had not participated in the murder. She also stated in that affidavit that Chatman’s death was her fault because she felt that her instruction to Garner to shoot Chat-man caused him to commit the murder. The prosecutor also presented Myles with letters she had sent Garner while both were incarcerated for the murder of Chat-man. In one letter, Myles told Garner she had never told the police he had shot Chatman. Myles explained at trial that in many of her letters she told Garner that she would make the district attorney believe she would testify against Garner, but at the last minute would refuse. She also promised Garner that she would try to talk to his attorney and come up with an alibi for him.
 

 The prosecutor showed Myles several letters that were sent to her by Garner while they were in jail. In one of the letters, Garner explained to Myles that he wanted her to act as if she would testify against him, but “tell their story” to the jury at trial. He also instructed her in a letter to tell the judge and jury that she was coerced into making the statement that implicated Garner as the shooter. Finally, in the last letter presented by the prosecution, Garner threatened Myles, inferring he would get her into trouble because she told him to “kill the bitch,” or “shoot the bitch.” ■
 

 On defense cross-examination, Myles explained that she refused to testify against Garner the first two times she was asked, but eventually told | nher attorney that she would testify if she were able to go home to be with her children. Eventually, on August 31, 2009, Myles met with her attorney and agreed to the plea bargain.
 

 The defense then presented Myles with several of the letters she had written Garner while in jail. In some of the letters Myles lied to Garner about being threatened by the district attorney and also about refusing to testify against him. In other letters she told Garner that the murder was her fault and that she would do whatever she had to in order to get Garner out of jail. She wrote Garner that Lash-unda Bright, Chatman’s sister, was in jail with her and that she was going to try to beat her up for telling police about Myles’s involvement in Chatman’s murder. In various other letters she wrote Garner, she stated that she knew he was innocent and that she would take responsibility for her actions.
 

 Victor W. Fearance testified for the state and admitted to a criminal history. Fearance testified that he went to 1815 Hickory Street on October 29, 2006, and that Chatman was at the house. His friend, Ronald Johnson (also known as “Goosey”), was waiting to get a truck from Chatman in exchange for cocaine. Fearance and Goosey then went to get gas for the Explorer at the Chevron station.
 

 Fearance testified that at the gas station a vehicle drove up and a man asked who owned the truck the men were driving. Fearance also stated that a female got out of the car and came over to the Explorer to look through the glove box. Fearance saw the man pull out a gun and then get into the vehicle with Fearance and Goosey. Fearance testified that the man wanted |10his car back, but that he and Goosey pleaded for a ride back to their car. He stated that when they got back to Hickory Street, he immediately went to get his car
 
 *590
 
 to leave. Fearance testified that as he was trying to get into his car he heard female voices and then one of the women said something like, “shoot her.” He then heard gunshots. Fearance and Goosey immediately left with another female. Fearance testified that he did not actually see the shooting.
 

 On cross-examination, Fearance admitted he had been drinking and smoking marijuana on the day of Chatman’s murder and that he had been awake for two and a half days at the time. Fearance also stated that the man with the gun never threatened to kill either him or Goosey. Fearance could not identify in a lineup the man or woman who approached him at the Chevron station. He stated that when he got to the address on Hickory his only concern was leaving, but he did notice a lot of people on the porch. He further admitted that he did not know who said “shoot the bitch,” or who actually shot Chatman.
 

 Lashunda Bright, Chatman’s sister, testified that she knew the Ford Explorer Chatman had in her possession was a stolen vehicle and that Chatman had the vehicle about a month before her death. She also testified that Chatman sold the vehicle to Myles who possessed it about a week before Chatman took it back. Bright testified that on the day Chatman stole the truck from Myles, Myles stopped by her house very upset. When Myles returned to Bright’s apartment with family members, Bright called the police. A little while after the police arrived Myles and her family left.
 

 |nOn cross-examination, Bright said Myles was “real aggressive” and kept cursing at her when she came to her apartment after Chatman stole the vehicle. She testified that Myles repeatedly said she was “going to get Jackie.” Bright testified that when she heard of her sister’s murder she told police that she believed Myles would have had a motive to kill her sister, although she had no firsthand knowledge of who killed Chatman.
 

 Daniel Davis, Jr. was the owner of the residence at 1815 Hickory Street. Davis was at his house at the time of Chatman’s murder and testified that he knew her. He testified that Chatman showed up at his residence with the Ford Explorer and that she and another young man talked for a while before the man left with the keys to Chatman’s vehicle. The young man also called a friend who arrived later, and the two left in the Ford Explorer. Davis testified he saw Chatman with cocaine after she gave the young man the key to the. truck. He understood the transaction to be a “rent-a-rock,” the renting of a vehicle for a rock of cocaine.
 

 Davis testified that later after the two men left in Chatman’s truck he heard arguing and fighting outside. Davis started to go outside to break up the fight, but heard two gunshots. He then quickly closed the door and dropped to the floor. Davis and two friends who were with him did not look out the window to try to see what was going on, but heard voices. Davis testified that he heard two shots and then heard Chatman say “you all ain’t got to do it like this” or something to that effect. He then heard another shot. Davis explained that from the time he first heard the arguing to the time he heard gunshots, approximately 20 to 80 seconds had elapsed. After 112the shooting stopped, Davis turned his porch light on to try to disperse the crowd. The Ford Explorer was gone and everyone else scattered.
 

 Detective Rod Johnson, a violent crimes investigator with the Shreveport Police Department, investigated the murder of
 
 *591
 
 Chatman.
 
 [2]
 
 On cross-examination, Detective Johnson admitted that, except for Myles, none of the other eyewitnesses identified Garner as the shooter. Detective Johnson additionally testified, however, that Myles’s version of the facts matched Fearance’s, a factor which he found important. In fact, Detective Johnson explained further that Myles’s statement was similar to those of all of the other witnesses he had interviewed.
 

 After the state rested, the defense called three witnesses. Angela Grant, Brian Garner’s older sister, testified that she thought Myles was obsessed with her brother. Deputy Gloria Evans of the Cad-do Parish Sheriffs Office testified that it is her duty to handle the mail at the Caddo Correctional Facility. She was unaware whether Garner and Myles had permission to write each other when they were incarcerated, although she knew that Myles was subjected to disciplinary action for writing letters to Garner using another inmate’s mail identification. Captain Rick Farris, the captain of security at Caddo Correctional Facility, testified that he received correspondence from Garner wherein he complained about having letters taken from him during a “shakedown.” Captain Farris attempted to find the letters that were taken from Garner, but was unable to do so. Captain Farris testified that Garner and Myles were not supposed to be communicating.
 

 11sWhen viewed in the light most favorable to the state, we find this evidence sufficient to convict Garner of the second degree murder of Chatman. Both Myles and Fearance testified that Garner possessed a gun when he entered the Explorer and traveled to Davis’s house where Chatman was located. Three individuals testified who were present at the shooting. Although Fearance and Davis could not identify the shooter, both recalled hearing women fighting and gunshots thereafter. Fearance recalled hearing a woman yelling “shoot her” right before shots rang out. The two men’s testimony corroborates Myles’s account that she told Garner, either to “shoot the bitch,” or “kill the bitch,” and immediately following her command Chatman was shot several times. Myles further testified that Garner was the only person with a gun when Chatman was shot.
 

 If believed, Myles’s testimony is sufficient to support the conviction even in the absence of physical evidence.
 
 State v. Robinson, supra; State v. Ponsell, supra. See also State v. Johnson, supra.
 
 Despite some inconsistencies in Myles’s pretrial statements, Fearance’s and Davis’ similar accounts of the events which surrounded the shooting corroborate Myles’s version of the events. That testimony is sufficient to establish that after an altercation between Chatman and Myles, it was Garner who shot the victim three times. Moreover, Garner’s forcibly taking back the vehicle from Fearance and confronting Chat-man with Myles clearly establishes his participation in the assault that resulted in the victim’s death.
 

 The jury was presented with Myles’s explanations of why she changed stories and her ultimate testimony that Garner was the shooter. |14 Great discretion is afforded to the jury in its assessment of Myles’s credibility and an appellate court is not in a position to assess that credibility determination or to reweigh the evidence. From the evidence before it, the jury could have reasonably found Garner guilty of second degree murder to the exclusion of every other hypothesis of in
 
 *592
 
 nocence beyond a reasonable doubt. This assignment has no merit.
 

 In his second assignment of error, Garner argues that the trial court’s use of a jury instruction on flight was in error because there was no evidence that he fled Louisiana in order to avoid apprehension. He further alleges that the instruction defining flight as “consciousness of guilt” was in error because the trial court does not have the requisite authority to comment on the evidence or instruct the jury as to what they must infer from the evidence.
 

 The trial court gave the following jury instruction regarding the flight of the defendant:
 

 If you find that the defendant fled immediately after a crime was committed or after the defendant was accused of a crime, the flight alone is not sufficient to prove that the defendant is guilty; however, flight may be considered along with all other evidence. You must decide whether such flight was due to consciousness of guilt or to other reasons unrelated to guilt.
 

 Garner objected to the instruction on the grounds that there was no evidence of flight elicited at trial. The court overruled the objection on the grounds of the testimony that Garner fled the scene of the crime and was ultimately arrested in Dallas.
 

 Flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience.
 
 State v. Durden,
 
 36,842 (La.App.2d Cir.04/09/03), 842 So.2d 1244,
 
 writ denied,
 
 03-1350 (La.11/26/03), 860 So.2d 1131. La. C. Cr. P. art. 802 provides:
 

 The court shall charge the jury:
 

 (1) As to the law applicable to the case;
 

 (2) That the jury is the judge of the law and of the facts on the question of guilt or innocence, but that it has the duty to accept and to apply the law as given by the court; and
 

 (3)That the jury alone shall determine the weight and credibility of the evidence.
 

 A requested special charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. La. C. Cr. P. art. 807;
 
 State v. McDuffey,
 
 42,167 (La.App.2d Cir.6/20/07), 960 So.2d 1175,
 
 writ denied,
 
 07-1537 (La.1/11/08), 972 So.2d 1163;
 
 State v. Gipson,
 
 28,113 (La.App.2d Cir.6/26/96), 677 So.2d 544,
 
 writ denied,
 
 96-2303 (La.1/31/97), 687 So.2d 402.
 

 In the instant case, the record provides support for the trial court’s granting of the state’s request for the special jury instruction regarding flight. There was testimony during trial that the defendant fled the scene of the crime immediately following the shooting. He fled to another house where he changed clothes and then left again. A short time after the murder Garner left Shreveport and went to Dallas.
 

 Moreover, the present instruction is broad. The court reminded the jurors of their duty to review all of the evidence presented and to draw from it whatever inference they thought proper. Thus, the jurors were not forced 11ñto choose between two inferences but were instructed either to consider that the evidence introduced was probative of the defendant’s guilt or that it was not.
 
 See, State v. McIntyre
 
 381 So.2d 408 (La.1980),
 
 cert. denied,
 
 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980). The court’s jury charge did not require qualification, limitation or explanation, and was wholly correct and pertinent. Thus, the instruction was properly given.
 

 
 *593
 
 In his third assignment of error, Garner claims that the trial court erred in granting the state’s motion
 
 in limine
 
 regarding Chatman’s naming of “Eric” to a Shreveport Fire Department employee while en route to the hospital, where she later passed away. Garner argues that Chat-man’s statement to the Shreveport Fire Department employee, and later relayed to Detective Ronald Johnson during his investigation, was a dying declaration, and therefore not hearsay.
 

 In regard to its witness, Detective Rod Johnson, the state argued in a motion
 
 in limine
 
 that a statement from Jacqueline Chatman regarding a person named “Eric” as she was being transported to the hospital should be ruled inadmissible. The prosecutor acknowledged the fact that the statement was made before Chatman’s death and, therefore, may have been a dying declaration. The state contended, however, that because it was not actually made in Detective Johnson’s presence, but was heard by someone working for the Shreveport Fire Department, the statement should still be considered inadmissible hearsay. Defense counsel argued that the statement was admissible since it was made to another “law-enforcement-type person” and was discovered during Detective Johnson’s investigation.
 

 |17The trial court granted the motion
 
 in limine,
 
 reasoning -that it was unclear whether the statement was a dying declaration. There was no explanation why Chatman had said the name “Eric”— whether it was in response to a question or whether “Eric” was a friend or family member. Additionally, the court held that even if the statement was a dying declaration, the proper person to testify as to the statement would be the fireman who actually heard Chatman say the name.
 

 La. C.E. art. 804(B)(2) provides an exception to the hearsay rule, when the de-clarant is unavailable, for a dying declaration, which is defined as “[a] statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.”
 
 State v. Griffin,
 
 01-0579 (La.3/7/01), 783 So.2d 1241, 1241-42.
 

 No factual basis exists to conclude that the statement made by Chatman on her way to the hospital was a dying declaration as defined in La. C.E. art. 804(B)(2). While it is reasonable to conclude that Chatman was under the belief that her death was imminent (she died later that evening), there exists no basis to determine whether her statement regarding a person named “Eric” concerned the cause of her fatal injuries. Because a person named “Eric” is not identified in relation to the crime scene, Chatman’s mention of that name has no relevance to the cause of her death. This assignment therefore has no merit.
 

 In his final assignment of error Garner claims that his sentence is excessive as it is grossly disproportionate to the crime committed;^ He claims that nothing in the record indicates that the imposed sentence (life imprisonment without the benefit of probation, parole or suspension of sentence) is necessary to avoid further criminal conduct by the defendant.
 

 La. R.S. 14:30.1(B) provides:
 

 Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
 

 On September 25, 2009, the trial court imposed the sentence required by La. R.S. 14:30.1(B), sentencing the defendant, Brian Garner, to life imprisonment without the benefit of probation, parole or suspension of sentence, to run concurrently with any
 
 *594
 
 other sentence he was required to serve and with credit for time served. He was further sentenced to 30 days in the parish jail in lieu of court costs, concurrently, with credit for time served.
 

 Because Garner failed to file a motion to reconsider sentence, his sentencing claims on appeal are limited to constitutional excessiveness.
 
 State v. Mims,
 
 619 So.2d 1059 (La.1993).
 

 A sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering.
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993);
 
 State v. Bonanno,
 
 384 So.2d 355 (La.1980).
 

 In addressing the mandatory sentence imposed by La. R.S. 14:30.1, this court has held that it is the legislature’s prerogative to determine the length of the sentence imposed for crimes classified as felonies, and the | ^courts are charged with applying these punishments unless they are found to be unconstitutional.
 
 State v. Koon,
 
 31,177 (La.App.2d Cir.2/24/99), 730 So.2d 503. So, the decision to assess mandatory life sentences for certain felonies is within the prerogative of the legislature.
 
 Id.
 
 The claim that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected.
 
 State v. Parker,
 
 416 So.2d 545 (La.1982);
 
 State v. Brooks,
 
 350 So.2d 1174 (La.1977);
 
 State v. Thompson,
 
 27,512 (La.App.2d Cir.12/6/95), 665 So.2d 643,
 
 writ denied,
 
 96-0232 (La.4/26/96), 672 So.2d 679. To rebut the presumption that the mandatory minimum sentence of La. R.S. 14:30.1 is constitutional, Garner must clearly and convincingly show that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
 
 State v. Gill,
 
 40,915 (La.App.2d Cir.5/17/06), 931 So.2d 409,
 
 writ denied,
 
 06-1746 (La.1/26/07), 948 So.2d 165.
 

 Here, the jury found that Garner shot Chatman at the direction of his girlfriend after the two women squabbled over a vehicle. Thus, without provocation, he shot an unarmed victim three times. Garner’s impetuous actions demonstrate a callous disregard for human life. In these circumstances, Garner has failed to show clearly and convincingly that the imposed sentence is not meaningfully tailored to his culpability. Thus, assignment therefore has no merit.
 

 12nError Patent
 

 On error patent review, we find that the trial court erred in ordering Garner to serve 30 days in default of payment of court costs. An indigent defendant cannot be subjected to default time in lieu of the payment of a fine, costs, or restitution.
 
 State v. Green,
 
 41,977 (La.App. 2 Cir. 5/16/07), 957 So.2d 891,
 
 State v. Mack,
 
 30,832 (La.App.2d Cir.6/24/98), 715 So.2d 126;
 
 State v. Hughes,
 
 587 So.2d 31 (La.App. 2d Cir.1991),
 
 writ denied,
 
 590 So.2d 1197 (La.1992). Indigence may be discerned from the record.
 
 State v. Green, supra; State v. Conway,
 
 604 So.2d 205 (La.App. 2d Cir.1992),
 
 writ denied,
 
 610 So.2d 797 (La.1993). Because Garner was appointed counsel at trial and is represented on appeal by the Louisiana Appellate Project, we may conclude that he was and is indigent. Considering the defendant’s indigency, we find that the sentence in lieu of payment of court costs was illegal, and we amend the sentence to delete that portion providing for the additional 30 days in default of court costs.
 

 Conclusion
 

 Garner’s conviction is affirmed. His sentence is amended to delete default time, and as amended, is affirmed.
 

 
 *595
 
 CONVICTION AFFIRMED; SENTENCE AMENDED AND AS AMENDED AFFIRMED.
 

 [1]
 

 . At trial, Dr. Frank Peretti, a forensic pathologist, testified that Chatman died as a result of three gunshot wounds. She had one gunshot wound through her left hand, which reentered her right upper chest and went into her lung. The two other bullets, one going through her back, the other through her left side, involved damage to her left kidney, spleen, stomach and vena cava vein. Dr. Peretti testified that Chatman had cocaine, ecstacy, methamphetamine and tranquilizers in her system at the time of her death. She was under the influence of ecstacy and cocaine.
 

 [2]
 

 . He testified consistently with the facts above regarding the identification of the burned Ford Explorer and the facts leading to his arrest of Myles.