Judgment rendered November 17, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,056-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

CONTRAVIOUS TRAVON VINSON            Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 363,156

Honorable Charles Gordon Tutt, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Bruce G. Whittaker

JAMES E. STEWART, SR.                      Counsel for Appellee
District Attorney

WILLIAM C. GASKINS
TOMMY J. JOHNSON
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and HUNTER, JJ.

**COX, J.**

This criminal appeal arises from the First Judicial District Court, Caddo Parish, Louisiana. Defendant, Contravious Travon Vinson ("Vinson"), was found guilty as charged of domestic abuse aggravated assault in violation of La. R.S. 14:37.7 (Count One) and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (Count Two). Vinson was adjudicated as a second felony offender and sentenced to five years at hard labor without benefit of probation, parole, or suspension of sentence imposed on Count One, to be served concurrently with a ten-year sentence for Count Two. He appeals his conviction, alleging that the evidence presented at trial was insufficient to convict him of either charge. For the following reasons, we affirm his conviction and remand this case for resentencing.

## FACTS & PROCEDURAL HISTORY

On December 12, 2018, Officer Sheena Morris ("Officer Morris") and Officer Matthew Dixon ("Officer Dixon") responded to a domestic abuse incident on 2735 Desoto Street involving Vinson and the victim, Quantiva Alford ("Alford"). According to Alford's statement to Officer Morris, she and Vinson dated for approximately five years, but were not together at the time of the incident. Alford explained that Vinson, who was currently staying with his cousin, just a few houses away from her, was recently released from jail and had sent her several threatening and harassing messages throughout the day.

Later that night, Alford stated that when she returned home from work, her sister, Tamesha Alford, helped her pack her belongings from the home and into her car. As they did, Alford stated that she saw a man at the

home where she knew Vinson was located. Moments later, she saw the man fire two gunshots in her general direction. Scared, Alford and her sister ran and called the police. Alford, believing that the man she saw was Vinson, reported what she saw and identified Vinson as the likely culprit. Alford identified the weapon used as a revolver based on her knowledge that Vinson either owned that type of gun or had access to one. After Alford informed Officer Morris and Officer Dixon that Vinson was with his cousin on 2826 Desoto Street, the officers went to the residence and arrested Vinson.

Vinson was later charged by amended bill of information with domestic abuse aggravated assault in violation of La. R.S. 14:37.7 and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1. On September 9, 2019, Vinson waived his right to a jury trial and elected to have a bench trial. On January 17, 2019, a preliminary examination was held and Officer Morris testified as follows:

Officer Morris first testified that on December 12, 2018, she and Officer Dixon, her training supervisor, responded to a domestic call on 2735 Desoto Street. Based on the information Alford reported, Officer Morris testified that Alford and her former boyfriend, Vinson, had been in a relationship for approximately five years and that Alford was pregnant at the time of the incident. She stated that Vinson was recently released from jail and had sent Alford several threatening messages. Officer Morris testified that she looked through Alford's phone to confirm the information, stating that the messages "went back and forth" and primarily consisted of Vinson asking when he could see Alford, and Alford asking Vinson not to contact her again.

2

Officer Morris testified that although Alford never explained why the conflict arose, Alford did report that as she packed her belongings in her car, she believed she saw Vinson fire two shots at her and her sister. In explaining the events leading up to the shooting, Officer Morris testified that Alford told her that she was "running up the street and he (Vinson) just started shooting at her." Officer Morris stated that the weapon involved was reported to be a revolver and that Vinson was only a few homes away from where Alford was located. After arriving at 2826 Desoto Street, the residence Alford directed the officers, Officer Morris testified that a woman, later identified as Laterrorica Griffin, Vinson's cousin ("Griffin"), answered the door. Officer Morris stated that Griffin initially told her that she didn't know who Vinson was, but later called for "Tray" after Officer Dixon told Griffin there could be repercussions for lying.

When Vinson emerged from the home, he told Officer Morris that he wasn't sure what was going on. At this time, Officer Morris testified that other members of the Shreveport Police Department ("SPD") arrived on the scene as she briefly looked through Vinson's phone to confirm the messages Alford previously showed her. Officer Morris stated that she and Officer Dixon asked Vinson whether he owned a revolver, to which he responded that he didn't know what the officers were referring to. At this time, Officer Morris stated that Griffin went inside, and she heard a gunshot. Immediately after, the other officers rushed into the home to retrieve the gun and Vinson was placed under arrest.

At the close of Officer Morris' testimony, the matter was continued until January 23, 2020, wherein the trial court heard testimony from several witnesses, including: Officer Morris, Officer Dixon, Alford, Vinson's sister,

3

Brittany Johnson ("Johnson"), Vinson, Lee Scott ("Scott"), an investigator for SPD, and Griffin.[1]

First, Officer Morris testified again. She clarified that while she was unaware of the specific details leading up to the incident, she knew that Alford and Vinson had an argument before the altercation occurred. Officer Morris stated that after she spoke to Alford, she recalled feeling skeptical about the situation and that based on Alford's body language, "something was off." Officer Morris explained that she thought Alford was either being dishonest, hiding something, or that Alford had deleted some of the messages before she read them.

Officer Morris explained that after she and Officer Dixon arrived at Griffin's home to speak with Vinson, she heard a male's voice reply that "nobody in here but me and my girl" before Griffin denied knowing who Vinson was. Officer Morris stated that sometime shortly after she spoke with Vinson, other members of SPD arrived on the scene and Officer Dixon asked Griffin to retrieve the gun. While Griffin was inside, Officer Morris stated that she heard a gun fire off, but stayed behind while the other officers went inside to take the gun from Griffin.

On cross-examination, Officer Morris stated that the revolver had six bullets inside the chamber after it was retrieved, but one was spent from when Griffin fired it. She stated that the spent casing was found on the floor

---

[1] Lieutenant VanZandt ("Lt. VanZandt") was also called as an expert in fingerprint examination and comparison. He explained that he was an investigation supervisor for SPD's crime scene investigation unit, and that his official title and certification for the department was a Certified Latent Print Examiner through the International Association for Identification. Lt. VanZandt took Vinson's fingerprints in open court and examined and compared the current prints to previous prints on a prior bill of information filed against Vinson. Lt. VanZandt confirmed that the prints he took from Vinson were the same prints found in the bill.

of the home and retrieved by another officer on the scene. The trial judge then inquired about the type of gun involved, questioning whether the gun was a revolver because of the casing on the floor. To this, Officer Morris replied that she recalled an officer picking up a spent casing after Griffin fired it off, but was unsure how revolvers worked, because she had never used that type of gun.

Next, Officer Dixon testified that on the night in question, he let Officer Morris question both Alford and Vinson because he was in the process of training Officer Morris, who had only been with SPD for five months. Officer Dixon confirmed that Alford reported that Vinson was the person she believed was responsible for shooting at her and her sister.

Alford then testified, identifying Vinson in open court.[2] Contrary to Officer Morris' testimony, Alford stated that although she had been in a relationship with Vinson before, it was brief and the two were just friends, that the two had never lived together, and that she had never been pregnant. When questioned about the messages exchanged between her and Vinson, Alford denied receiving any messages from Vinson because he was just released from jail and did not own a phone at that time.[3] She stated that she saw Vinson once, earlier that day, and when questioned if she had seen him that evening, she responded, "No. Until I seen–I knew–no. I did not see him."

---

[2] Alford was reluctant to testify and her testimony in court differed from her reports to responding officer on the night of the incident and later statements she made to responding officers prior to trial. In response to the court ordering her to remain in the courtroom twice, Alford stated, "I'm not trying to get on the stand and testify on him (Vinson)."

[3] Alford noted that she never showed Officer Morris any text messages between her and Vinson for this reason as well.

In describing the movements before the incident occurred, Alford stated that it was dark outside when she returned home from work to pack her belongings. She stated that while she and her sister packed the car, she saw a man outside of Griffin's home, dressed in all black. A few moments later, she heard gunshots, but indicated that she did not know who fired the shots or where the shots were directed. Specifically, Alford stated that she saw "somebody outside at his [Vinson] cousin's house when I was going inside to get my belongings to get back in the car, and that's when we heard shots, but it wasn't nothing hit, so he could've been shooting in the air. I don't know."

In addressing her report to responding officers that Vinson was responsible for the shooting, Alford stated, "I mean, he was outside. They [were] outside. That's where the shots came from, was there. But was he intending to shoot at me and my sister, we don't know because it wasn't nothing hit." She stated that when she reported this, she "made a statement saying that the shots [were] fired from that location, thinking that it was coming towards us, but wasn't nothing hit down there, so he could've been shooting in the air." With respect to the type of gun involved, Alford stated that she likely didn't describe the type of weapon because it was dark and she wasn't physically close enough to identify the weapon. The State then introduced and played a recording of Alford while she sat in the back of an officer's patrol car. After the video finished playing, Alford confirmed that the person in the video was her.

Defense counsel then questioned whether Alford attempted to contact Vinson to apologize while he was held in the Caddo Correctional Center. Alford denied ever having contacted Vinson at any point after December 12,

6

2018, because to her knowledge, Vinson did not have a phone. However, she admitted that she did contact Vinson's sister to pass along a message for Vinson to stop contacting her.

Next, Johnson, Vinson's sister, testified. Johnson stated that Alford and Vinson had been in a relationship for approximately seven years and throughout that time, lived together. She stated that from what she witnessed of Alford's and Vinson's relationship, the pair fought on at least three to five different occasions, with Alford often being the aggressor. For example, Johnson testified that she saw Alford stab Vinson with a kitchen knife, and that on several other occasions, she heard Alford threaten Vinson.

Vinson then testified on his own behalf. He stated that he had known Alford for approximately eight years and that the pair had lived together since March 2013. Vinson testified that prior to the incident, he had not spoken to Alford for three days because he was in jail on a prior domestic abuse charge. On the day in question, Vinson claimed that while he had not seen Alford, she sent him several threatening messages.

With respect to the revolver recovered that night, Vinson first denied ownership of the gun. He then argued that there was genuine dispute as to where the gun was found, stating that the police reports indicating that Griffin brought the gun outside to the officers, was false. Vinson asserted that the audio from that night established that the responding officers directed Griffin to retrieve the revolver, where she then accidentally fired off the gun. Thereafter, the officers, without consent, retrieved the revolver from the floor of the home.[4]

_____

[4] On cross-examination, the State questioned Vinson's credibility by listing his previous charges and convictions as follows: 1) a misdemeanor charge for flight from an

7

Scott, an investigator for SPD, testified on the State's behalf as to phone calls and text messages Vinson sent and received while in jail. Scott explained that as a part of his regular duties, he identifies incoming and outgoing jail text messages and phone calls. Scott explained that for any inmate to either place a call or send a text message, he must use either his name or assigned pin number. The State then introduced a series of text messages from Vinson's pin number to a woman identified as Sharniece Johnson.[5] Scott read the message aloud as follows:

> Good morning, beautiful, Bay. I woke up out of a dream about me, Nu-Nu and my momma was at Nu-Nu house and it was a lot of white people outside shaking my head. Somebody need come see Nu-Nu and talk to her as soon as possible. I got a feeling that they going to try to use her against me; I mean, why not, they don't have [expletive] S. She need to tell them that's her boyfriend [expletive] and I ain't no that [expletive] was in there, or just keep her mouth shut, for real, for real. I love you, Ms. Vinson, and it won't be long, God got us.

Scott stated that while there currently isn't a mechanism in place which prevents an inmate from using another's pin number to make a call or send a message, he is able to identify inmates by their voices or particular topics discussed, and in this particular case, he was able to identify voices because of certain topics discussed during the call.

---

officer and resisting arrest in 2011; 2) a misdemeanor charge for aggravated assault in 2012; 3) a conviction for carrying a concealed weapon in 2012; 4) a conviction for theft in 2012; 5) a misdemeanor charge for property damage; 6) misrepresentation during booking in 2014; 7) simple battery in 2018; 8) a prior conviction for possession with intent to distribute; and 9) a conviction for attempted possession of a firearm or carrying a concealed weapon in 2016.

[5] Scott explained that he was able to identify the recipient of the message as Sharniece Johnson because "[o]nce a person purchase[s] minutes from the City Telecoin, which owns the system, they use their names in order to purchase the account. And so I'm able to, by the phone number, all I have to do is put the cursor over the number and it identifies the person who the number belongs to. And in reference to the text message, it actually shows the person['s] name who is receiving the text message or sending the text message."

Finally, Griffin testified that she had been in jail a few weeks before trial commenced. She testified that while in jail, she received a message from Sharniece Johnson, asking her to testify about specific information in relation to Vinson's case. Griffin agreed that in response, she sent the following text message:

> Stop sending all them messages, I'm in jail. Tell Brittany I'll call her when I get out and tell Tray I'm not taking no charge. I'm not fin to go to jail, I don't know why he put me in that [expletive]. He need[s] to think of a better plan and let me know cause that ain't it.

Griffin then identified her voice from a recorded phone call as part of the State's evidence. Griffin explained that on the night in question, her then boyfriend was also in the house when officers asked to speak with Vinson. She clarified that officers never asked if the revolver she retrieved belonged to Vinson.

At the close of testimony, the court found Vinson guilty as charged on both counts and the State filed a second felony habitual offender bill against Vinson. On June 25, 2020, the trial court sentenced Vinson to five years at hard labor without benefit of probation, parole, or suspension of sentence imposed on Count One, to be served concurrently with a ten-year sentence for Count Two.

### DISCUSSION
*Sufficiency of the Evidence*

On appeal, Vinson alleges that the evidence presented at trial was insufficient to support his convictions for domestic abuse aggravated assault and possession of a firearm by a convicted felon. We disagree.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797. The Jackson standard, now legislatively embodied in La. C. Cr. P. art. 821, does not afford appellate courts with a means to substitute its own appreciation of the evidence for that of the fact finder. *Steines, supra*.

The *Jackson* standard also applies in cases involving both direct and circumstantial evidence. An appellate court which reviews the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is viewed as such, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983).

Likewise, if a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *see also*, *State v. Mingo*, 51, 647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 17-1894 (La. 6/1/18), 243 So. 3d 1064. The appellate court will review the evidence in the light most favorable to the prosecution and determine whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417; *State v.*

10

*Garner*, 45,474 (La. App. 2 Cir. 8/18/10), 47 So. 3d 584, *writ not considered*, 12-0062 (La. 4/20/12), 85 So. 3d 1256.

In the absence of any internal contradiction or irreconcilable conflict with physical evidence, the testimony of the witness, if believed by the trier of fact, alone is sufficient support for a requisite factual conclusion. *State v. Elkins*, 48,972 (La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 152 So. 3d 438; *State v. Wiltcher*, 41,981 (La. App. 2 Cir. 5/9/07), 956 So. 2d 769. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36, 180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 6/27/03), 847 So. 2d 1255. The appellate court neither assesses the credibility of witnesses nor reweighs evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/03), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422.

First, Vinson argues that there is insufficient evidence to sustain his conviction for domestic abuse aggravated assault in violation of La. R.S. 14:37.7, primarily because the victim, Alford, testified that she did not believe that she was in any actual danger of receiving a battery when she stated:

> We just heard some shots being fired. It ain't hit nothing or the house or nothing. We didn't know if he was just shooting at us or not so. . .I mean, I seen somebody outside at his cousin's house when I was going inside to get my belongings to get back in the car, and that's when we heard shots, but it wasn't nothing

11

hit, so he could've been shooting in the air. I don't know. . . But was he intending to shoot at me and my sister, we don't know because it wasn't nothing hit.

We disagree.

Domestic abuse aggravated assault, pursuant to La. R.S. 14:37.7,[6]

provides in pertinent part:

> A. Domestic abuse aggravated assault is an assault with a dangerous weapon committed by one household member or family member upon another household member or family member.

There are several inconsistencies in Alford's testimony at trial. Specifically, on the night in question, Alford initially reported, as evidenced in the State's recording from the police unit, that she and Vinson had been romantically involved and lived together before Vinson was arrested and sent to jail for a previous domestic abuse charge. However, at trial, Alford denied having a long-term relationship with Vinson, that the two never lived together, and that she has never been pregnant.

Despite the inconsistencies in Alford's testimony, we find that the testimony of the other witnesses and the evidence presented at trial are sufficient to overcome any deficiencies in Alford's testimony. Specifically, Officer Morris, Johnson, and Vinson each testified that Alford and Vinson had been involved in a romantic relationship for at least five years. Vinson

---

[6] La. R.S. 14:37.7(B). For purposes of this Section: (1) "Family member" means spouses, former spouses, parents, children, stepparents, stepchildren, foster parents, foster children, other ascendants, and other descendants. "Family member" also means the other parent or foster parent of any child or foster child of the offender. (2) "Household member" means any person presently or formerly living in the same residence with the offender and who is involved or has been involved in a sexual or intimate relationship with the offender, or any child presently or formerly living in the same residence with the offender, or any child of the offender regardless of where the child resides.

and Johnson further clarified that throughout the duration of this relationship, from at least March 2013, Alford and Vinson lived together. In considering the aforementioned testimony as to Alford and Vinson's relationship, we find that the trial court reasonably concluded that Alford was "formerly living in the same residence with the offender and who is involved or has been involved in a sexual or intimate relationship with the offender" pursuant to La. R.S. 14:37.7.

Second, Vinson briefly argues that there is insufficient evidence to sustain his conviction for possession of a firearm by a convicted felon. Specifically, Vinson asserts that the entirety of the State's argument rests upon Alford's initial claim that Vinson was responsible for the shooting; however, at trial, Alford recanted these statements. We disagree. After viewing the evidence in the light most favorable to the State, we find that the evidence produced at trial was sufficient to convict Vinson of possession of a firearm by a convicted felon.

La. R.S. 14:95.1 provides in pertinent part:

A. It is unlawful for any person who has been convicted of ... simple burglary ... [or] burglary of an inhabited dwelling to possess a firearm or carry a concealed weapon.
...
D. For the purposes of this Section, "firearm" means any pistol, revolver, rifle, shotgun, machine gun, submachine gun, black powder weapon, or assault rifle which is designed to fire or is capable of firing fixed cartridge ammunition or from which a shot or projectile is discharged by an explosive.

To convict a defendant for possession of a firearm pursuant to La. R.S. 14:95.1, the State must prove the following elements beyond a reasonable doubt: 1) the defendant was in possession of the firearm; 2) he was previously convicted of one of the felonies enumerated in La. R.S. 14:2(B); 3) the 10-year statutory period has not passed; and 4) the defendant

14

had general intent to commit the offense. La. R.S. 14:95.1; *State v. Husband*, 437 So. 2d 269 (La. 1983); *State v. Hawkins*, 52,086 (La. App. 2 Cir. 8/15/18), 253 So. 3d 899; *State v. Drayton*, 46,191 (La. App. 2 Cir. 4/13/11), 63 So. 3d 319, *writ denied*, 11-2343 (La. 6/1/12), 90 So. 3d 430.

Actual possession necessitates having an object in one's possession or on one's person in such a manner as to have direct physical contact with and control of the object. *State v. Hill*, 53,286 (La. App. 2 Cir. 3/4/20), 293 So. 3d 104 citing *State v. Ruffins*, 41,033 (La. App. 2 Cir. 9/20/06), 940 So. 2d 45, *writ denied*, 06-2779 (La. 6/22/07), 959 So. 2d 494. In contrast, constructive possession of a firearm occurs when the firearm is subject to the defendant's dominion and control. A defendant's dominion and control over a weapon constitutes constructive possession even if it is only temporary in nature or the control is shared. *State v. Law*, 45,435 (La. App. 2 Cir. 8/11/10), 46 So. 3d 764; *State v. Hill*, *supra*.

However, mere presence of a defendant in the area of the contraband or other evidence seized alone does not prove that he exercised dominion and control over the evidence and therefore had it in his constructive possession. *State v. Hill*, *supra*; *State v. Stephens*, 49,680 (La. App. 2 Cir. 5/20/15), 165 So.3d 1168. Constructive possession entails an element of awareness or knowledge that the firearm is there and the general intent to possess it. *State v. Law*, *supra*. Such guilty knowledge may be inferred from the circumstances of the transaction and proved by direct or circumstantial evidence. *State v. Hill*, *supra*.

Again, we note that there are several inconsistencies in Alford's testimony at trial. Alford initially reported that after Vinson was released from jail, he continuously sent threatening and harassing messages to her

14

throughout the day and that when she returned home that night to retrieve her belongings, she witnessed Vinson fire two shots at her and her sister. However, at trial, Alford largely recanted her statements to Officer Morris, testifying that she didn't actually see Vinson firing a weapon, nor did she actually identify the weapon used. Nevertheless, the testimony and evidence presented at trial sufficiently prove that Vinson was responsible for the shooting.

Officer Morris testified that Alford was not only able to identify Vinson as the shooter, despite the distance and time of day, but also provided officers with his location, where he and the identified weapon were later found. Bolstering this, the State introduced the recording of Alford while she was in the back of a police car, where she then repeated this information again, identifying Vinson as the culprit. Additionally, Griffin testified that while in jail, Vinson sent a message to her through Sharniece Johnson, asking her to testify in a certain manner when called to testify in court. The message, when introduced, alluded to Griffin taking the blame for Vinson. Importantly, the following text messages are provided in the record:

> Good morning, beautiful, Bay. I woke up out of a dream about me, Nu-Nu and my momma was at Nu-Nu house and it was a lot of white people outside shaking my head. Somebody need come see Nu-Nu and talk to her as soon as possible. I got a feeling that they going to try to use her against me; I mean, why not, they don't have [expletive] S. **She need to tell them that's her boyfriend [expletive] and I ain't no that [expletive] was in there, or just keep her mouth shut, for real, for real.** I love you, Ms. Vinson, and it won't be long, God got us.
>
> . . .
>
> Stop sending all them messages, I'm in jail. Tell Brittany I'll call her when I get out and tell **Tray I'm not taking no charge. I'm not fin to go to jail, I don't know why he put me in that**

**[expletive]. He need to think of a better plan and let me know cause that ain't it.**

. . .

Okay he say tell you that y'all have to go to court Thursday about the gun charge. . . **he say tell them people that it wasn't his [and] you didn't give them nothing[.] [T]hey came in your house [and] got it**. . . but I'll let him know when he call me back. (Emphasis added).

The trial court, in considering Alford's inconsistent statements with that of the aforementioned testimony and text messages, concluded that Vinson was responsible for the incident and that Alford's inconsistent statements and reluctance to testify in court stemmed either from fear or a desire to cover for Vinson's actions. Specifically, the trial court stated,

> So throughout her testimony, even though she was clearly for whatever reason trying to help Mr. Vinson, and I don't know her reason then or I don't know her reason at the time, but clearly at the time this incident went on, she was saying that Mr. Vinson was shooting. And if [he] was shooting in the air, he was trying to shoot—trying to scare her. And I don't see any [sic] other factual scenario that fits here.

> I believe the record showed that when the police went to the house, that Mr. Vinson came from outside or something and the gun was inside. The woman is clearly, his [cousin], has clearly said the gun was not [sic] hers and it wasn't anybody else's that it could be. He wanted her, apparently, to blame her [sic] new boyfriend or her boyfriend at the time, but she wasn't willing to do that either.

> So[,] I believe that the evidence is clear and proves beyond a reasonable doubt that Mr. Vinson fired those shots.

Moreover, the trial court still found that Alford, despite her contrary statements, still indicated that Vinson was responsible for the shooting. Specifically, when asked about her statement to officers that she believed that Vinson was responsible for the shooting she responded:

> I mean, he was outside. They [were] outside. That's where the shots came from, was there. But was he intending to shoot at me and my sister, we don't know because [sic] wasn't nothing hit. . . I mean, we heard shots. We [were] the only ones

16

> outside, so we g[o]t out the way. . . Yeah, that's where they got the gun from.

We agree.

Given the testimony and text messages presented at trial, this Court finds that the trial court could have found, beyond a reasonable doubt, that Vinson was responsible for the shooting. While Alford's inconsistent statements are noteworthy, it does not amount to the quality of inconsistency necessary to undermine the trial court's decision to credit her testimony establishing the elements of the offense, including identifying Vinson as the shooter. Accordingly, when the evidence presented in this case is viewed in the light most favorable to the prosecution, a rational trier of fact could have found, beyond a reasonable doubt, each element of the crime of possession of a firearm by a convicted felon. Accordingly, this assignment of error is meritless.

*Illegally Lenient Sentence*

Our errors patent review reveals that Vinson's sentence is illegally lenient. On December 12, 2018, Vinson committed domestic abuse aggravated assault in violation of La. R.S. 14:37.7, and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1. The current habitual offender statute, La. R.S. 15:529.1, provides:

> (A) Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
>
> ....
>
> (3) If the third felony is such that upon a first conviction, the offender would be punishable by imprisonment for any term less than his natural life then:

17

(a) The person shall be sentenced to imprisonment for a determinate term not less than two-thirds of the longest possible sentence for the conviction and not more than twice the longest possible sentence prescribed for a first conviction [.]

Subsection K was added to the Habitual Offender Law by Act 542 of 2018. This subsection provides:

K. (1) Except as provided in Paragraph (2) of this Subsection, notwithstanding any provision of law to the contrary, the court shall apply the provisions of this Section that were in effect on the date that the defendant's instant offense was committed. (2) The provisions of Subsection C of this Section as amended by Act Nos. 257 and 282 of the 2017 Regular Session of the Legislature, which provides for the amount of time that must elapse between the current and prior offense for the provisions of this Section to apply, shall apply to any bill of information filed pursuant to the provisions of this Section on or after November 1, 2017, accusing the person of a previous conviction.

The Louisiana Supreme Court in *State v. Lyles*, 19-00203 (La. 10/22/19), 286 So. 3d 407, found that the Legislature created three categories of defendants potentially affected by Acts 282 and 542:

1. There are persons. . . whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed before that date. Those defendants would be eligible to receive the benefits of all ameliorative changes made by Act 282.

2. There are persons whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed between that date and August 1, 2018 (the effective date of Act 542). Those persons would be eligible to receive the benefit of the reduced cleansing period, and they may also have colorable claims to the other ameliorative changes provided in Act 282, although we need not decide that question today.

3. Finally, there are persons whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed on or after August 1, 2018. They would receive the reduced cleansing period by operation of Subsection K(2) added by Act 542 but their sentences would be calculated with references to the penalties in effect of the date of commission in accordance with Subsection K(2) added by Act 542.

18

Here, the State filed a habitual offender bill of information on March 11, 2020. Following a bench trial, on June 25, 2020, Vinson was convicted of domestic aggravated assault and possession of a firearm by a convicted felon. Accordingly, Vinson falls into the third category of *Lyles* defendants.

With respect to a conviction for domestic abuse aggravated assault, La. R.S. 14:37.7 provides, in part:

> C. Whoever commits the crime of domestic abuse aggravated assault shall be imprisoned at hard labor for not less than one year nor more than five years and fined not more than five thousand dollars.

Possession of a firearm by a convicted felon, under La. R.S. 14:95.1 provides, in part:

> B. Whoever is found guilty of violating the provisions of this Section shall be imprisoned at hard labor for not less than five nor more than twenty years without the benefit of probation, parole, or suspension of sentence and be fined not less than one thousand dollars nor more than five thousand dollars. Notwithstanding the provisions of R.S. 14:27, whoever is found guilty of attempting to violate the provisions of this Section shall be imprisoned at hard labor for not more than seven and one-half years and fined not less than five hundred dollars nor more than two thousand five hundred dollars.

Therefore, pursuant to La. R.S. 15:529.1, Vinson's sentence should have been two-thirds of his longest possible sentence, which in this case, is 20 years. A defendant in a criminal case does not have a constitutional right or a statutory right to an illegally lenient sentence. *State v. Williams*, 00-1725 (La. 11/28/01), 800 So. 2d 790; *State v. Burns*, 53,250 (La. App. 2 Cir. 1/15/20), 290 So. 3d 721. An illegally lenient sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. La. C. Cr. P. art. 882(A). This correction may be made despite the failure of either party to raise the issue. *See State v. Williams*, *supra*; *State v.*

*Leday*, 2005-1641 (La. App. 3 Cir. 5/3/06), 930 So. 2d 286; *State v. Burns, supra.*

Although this Court is not required to correct an illegally lenient sentence, *State v. Dock*, 49,784 (La. App. 2 Cir. 6/3/15), 167 So.3d 1097, this Court, in its discretion, remands this matter to the trial court for resentencing as the trial court is in a better position to make this determination based on the availability of the presentence investigation of that court.

## CONCLUSION

For the aforementioned reasons, Vison's conviction is affirmed and his sentence is vacated and this case is remanded for resentencing.

**AFFIRMED; REMANDED FOR RESENTENCING.**