Judgment rendered May 21, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,286-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

TOBY TOSHAWN JACKSON                        Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2019CR2868

Honorable Walter Meter Caldwell, IV, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Paula C. Marx

ROBERT S. TEW                        Counsel for Appellee
District Attorney

S. CHARLOTTE FARSHIAN
Assistant District Attorney

* * * * *

Before PITMAN, COX, and STEPHENS, JJ.

**COX, J.**

This criminal appeal arises from the Fourth Judicial District Court, Ouachita Parish. Toby Jackson ("Jackson") was convicted of two counts of second degree murder and sentenced to life imprisonment for both counts, with each sentence to run consecutively. For the reasons expressed herein, Jackson's convictions are affirmed.

**FACTS**

On May 8, 2019, officers from the Ouachita Parish Sheriff's Office ("OPSO") were dispatched to Stubbs Vinson Road in Monroe following a report that a man had been seen lying in the road. Officers identified the man as Anthony Ronald Miletello ("Miletello") and discovered Miletello had been shot four times in the head, and twice more in his back. After securing the scene, officers dispatched to Miletello's home at 1405 Filhiol Avenue where they discovered Miletello's mother, Marcia Lolley ("Lolley"), who lived with him, was also dead and had several stab wounds across her body.

After officers discovered Miletello primarily communicated through Facebook Messenger, Investigator Joshua Foster ("Inv. Foster") obtained a search warrant for Miletello's account, and two weeks later discovered that the last people Miletello messaged on the night he was murdered were Trey Jackson, an alias for Jackson, and Candance Cooper ("Cooper"). According to the messages, Jackson inquired about purchasing a gun from Miletello, while Miletello agreed to exchange a gun for drugs from Cooper. From this, Inv. Foster obtained a search warrant for Jackson's and Cooper's accounts to confirm the agreement, and the trio agreed to meet for the exchange.

Jackson and Cooper were interviewed by OPSO, wherein Jackson invoked his *Miranda* rights and declined to provide a statement. However, Cooper told officers that on May 7, 2019, Miletello agreed to meet at her apartment on 1713 Filhiol Avenue to complete the transaction. Cooper explained that while Miletello waited on her, she dropped Jackson off at Miletello's home because he planned to rob Miletello of his gun collection. When Jackson returned to her apartment, they took Miletello to an unknown location where Jackson and Miletello exited the car, and shortly after, she heard several gunshots but noted that only Jackson returned to the car.

After Cooper provided her statements to officers, she and Jackson were arrested, and a bill of indictment was filed against Jackson on August 16, 2019, for two counts of second degree murder of Miletello and Lolley. On August 26, 2019, Jackson appeared for arraignment and pled not guilty to both counts. After several delays, trial commenced on December 11, 2023, wherein the following testimony was presented:

First, Inv. Foster, the lead investigator in this case, identified Jackson in open court and explained that on May 8, 2019, he was dispatched to Stubbs Vinson Road, where he discovered Miletello's body. After he and other officers were dispatched to Miletello's residence, they immediately noticed that the back door was open, conducted a protective sweep of the area, and discovered Lolley's body in a hallway with nine stab wounds across her body. The State introduced photographs of Miletello's home, where Inv. Foster identified a room with a pool table, and Miletello's room where officers recovered two inoperable AR-15 firearms and a BB gun.

Inv. Foster testified that he had no leads as to who committed the murders until two weeks later when Miletello's family and friends revealed

2

Miletello primarily communicated through Facebook messenger. A letter of preservation and a search warrant were sent to retrieve Miletello's messages, where it was discovered that Miletello's last messages were sent to Jackson, who used the username Trey, and Cooper, who were in a relationship. Inv. Foster stated that he obtained search warrants for both accounts, and found that, starting May 1, 2019, until May 7, 2019, Miletello, Jackson, and Cooper discussed exchanging drugs for one of Miletello's guns. Inv. Foster concluded that they were friends, and Jackson had been to Miletello's home previously.

Inv. Foster discovered that Jackson and Cooper deleted their messages with Miletello, but he was able to see the conversations through Miletello's account. In reviewing the messages between Jackson and Miletello, Inv. Foster testified that Jackson asked several times about obtaining a gun from Miletello, who informed Jackson it would take about a week to get anything back to him, and Jackson replied, "Yes. Just let me know. Don't be telling me some s**t to just be saying it." Inv. Foster noted that on May 7, Miletello offered to sell Jackson a Taurus curve 380 handgun for $300, and sent a picture of the gun to Jackson, who replied he did not want to pay that amount of money for that kind of gun, and later stated, "Man, what you talking about with those guns? Man, you playing. I got money now [expletive]."

Inv. Foster explained that this was particularly important because Miletello had been messaging Cooper at the same time, attempting to trade a gun for heroin. He explained that Miletello sent Cooper several pictures of guns spread across his bed, which had a distinct floral pattern, which helped officers later identify Miletello's room. Inv. Foster stated that Cooper sent

3

those same pictures to Jackson, so Jackson was aware of the full range of guns Miletello owned as he negotiated to get a gun. Inv. Foster testified that later that day, both Cooper and Jackson messaged Miletello, asking him to meet Cooper at her apartment, which was down the road from Miletello's home.

Inv. Foster stated that when he contacted Cooper, she was combative and dishonest about the events leading up to Miletello being killed. Later, Cooper cooperated and told officers that Jackson planned to rob Miletello while she kept Miletello at her apartment. However, when something went wrong with Jackson's plan, she took Jackson and Miletello to Stubbs Vinson Road, and after Jackson and Vinson exited the vehicle, she heard six gunshots and only Jackson returned to the vehicle. In searching Cooper's home, officers recovered a .09mm Taurus, and although Jackson's DNA was present on the gun, it was determined this was not the gun used to kill Miletello.

On cross-examination, Inv. Foster admitted that the stolen guns or knife used to stab Lolley were never recovered, but that officers were able to confirm that Cooper drove over Miletello's body because DNA was found on the undercarriage of the vehicle, and Cooper placed Jackson in the vehicle at the time Miletello was shot. Inv. Foster further testified that when he found the vehicle Cooper drove, he discovered it belonged to Andrea Guchereau ("Guchereau"), and that it had been towed to a company in Shreveport to be sold for parts.

Next, Cooper, Jackson's former girlfriend, identified Jackson in open court and stated that she had known Jackson since January 2019. Cooper stated that she sold drugs to supplement her income, and Miletello had been

4

one of her clients. Cooper stated Jackson knew Miletello and had been to Miletello's home, which was down the road from her apartment, to either drop drugs off or play pool.

In describing the events leading to Miletello's murder, Cooper testified that on May 7, 2019, Miletello messaged her through Facebook, wanting to trade a gun for heroin. Miletello sent several pictures of the guns he owned, and in turn, Cooper sent those pictures to Jackson who was with her while she messaged Miletello. According to Cooper, Jackson had also been messaging Miletello at the same time, trying to get a gun for himself; however, he was frustrated because Miletello either did not have or was not willing to offer the type of gun Jackson wanted. She stated that Jackson, instead, wanted the guns seen in the pictures Miletello sent her.

Cooper stated that she borrowed Guchereau's vehicle to run errands with Jackson later that same day. Cooper testified that she and Jackson both messaged Miletello, asking him to meet her at her apartment to exchange the gun and drugs. She explained that Jackson told her to drop him off at Miletello's home to "check some s**t out," which she understood to mean that Jackson had planned to rob Miletello for the guns he saw in the pictures. While Jackson did this, Cooper was to keep Miletello occupied at her apartment, which she did by completing the deal, in which she traded heroin for a .45 Smith & Wesson and discussed Miletello's children. Cooper admitted she had taken methamphetamine, but from previous use, she built a tolerance for it, so she was still aware of what was happening around her.

Cooper stated that about 30 to 45 minutes later, Jackson called her from outside her apartment and said, "s**t went wrong," and that he would have to kill Miletello, which she understood to mean that Jackson hurt

someone. Cooper then explained that Jackson came inside, washed his hands, and asked her to drive him and Miletello to test shoot a gun. Cooper stated that she left the gun Miletello gave her and assumed Jackson had already put another gun in the trunk of Guchereau's vehicle because the vehicle was always unlocked. Cooper drove out to a remote location on Stubbs Vinson Road, but because she was four months pregnant and scared, she stayed in the vehicle while Jackson and Miletello got out. Although it was dark, Cooper could hear the trunk open and close and could just see the pair walk toward the right, and shortly after, heard six gunshots before Jackson returned and told her to drive. Cooper stated that she accidentally ran over Miletello's body, and Jackson broke and threw a phone out of the window that she assumed was Miletello's.

Cooper testified that the evening after Miletello was shot, she and Jackson agreed to delete their messages with Miletello, and sometime after, Jackson left and returned with a long black gun bag. Cooper explained that the bag was long enough to fit ARs and she assumed the bag contained Miletello's guns because he also had AR-15s and she knew that Jackson had planned to rob Miletello. After expressing that she did not want the guns in her home, Jackson got the bag and asked her to take him to his mother's home in Shreveport. Cooper admitted that when she was initially questioned by law enforcement, she thought she was in trouble for violating her parole and lied to protect herself. However, after learning that she and Jackson were being questioned for Miletello's murder, she again admitted she lied to protect herself and Jackson but later wanted to tell the truth.

Next, Ms. Kari Dicken ("Dicken") of the North Louisiana Crime Lab and an expert in forensic DNA analysis, testified that she completed a DNA

6

report for Lolley and Miletello, wherein she tested all submitted evidence from OPSO to determine whether DNA from either Jackson or Cooper was present. Regarding Lolley, Dicken testified that she tested Lolley's fingernails for any presence of DNA, and found a major and minor contributor, with one belonging to Lolley as the major contributor, but did not have enough DNA sample to create a profile for the second contributor. With respect to Miletello, Dicken testified she took swabs of several items from the area Miletello was found, including the cigarette butts, shell casings, and the .09mm Taurus handgun officer recovered. Dicken explained that the samples from the cigarette butts were inconsistent with the DNA samples from either Jackson, Cooper, or Miletello. However, Jackson's DNA was found on the handgun.

Dicken admitted that although several items did not have Jackson's DNA present on them, she clarified that this did not mean Jackson did not touch them, only that there was not a sufficient amount of DNA present to create a profile, which is influenced by various factors, including whether the person who touched an item washed their hands, briefly touched the item, or whether another person touched the same item either before or after.

Finally, Dr. Frank Peretti ("Dr. Peretti"), an expert in the field of forensic pathology, testified that he performed Lolley's and Miletello's autopsies. With respect to Lolley, Dr. Peretti concluded that Lolley's cause of death was due to nine different stab wounds across her body, which were likely inflicted by a kitchen knife. Dr. Peretti explained that Lolley had been stabbed three times in her chest, and then six more times in her back, with at least two wounds hitting a vital organ and major blood vessels which resulted in internal bleeding that either caused or contributed to her death.

7

With respect to Miletello, Dr. Peretti concluded that although there was heroin present in Miletello's system, his cause of death was six gunshots and each was fatal because it contributed to blood loss. Dr. Peretti explained that there was stipple present on Miletello's skin, which indicated several shots were fired at close range. He also identified that some of the shots entered through the neck, left ear, head, and lower back.

At the close of testimony, the jury unanimously found Jackson guilty of both counts of second degree murder. Sentencing took place on May 7, 2024, and victim impact statements were read into the record. Over the objection of counsel, Jackson provided a statement in response to each statement, indicating that he still maintained his innocence and that his heart went out to the victims' families. At the close of all statements, the trial court subsequently sentenced Jackson to two consecutive life sentences, and an objection was lodged. This appeal followed.

## DISCUSSION

On appeal, Jackson argues that there was insufficient evidence to convict him of the second degree murder of Lolley and Miletello because no "fingerprints, DNA evidence, or physical evidence" was presented at trial which linked him to either the shooting or stabbing; instead, he contends, the State's case rested entirely upon Cooper's testimony and messages sent on social media.

Specifically, regarding count one, for Lolley's murder, Jackson argues that there was no physical evidence to link him to the murder; instead, the State relied entirely on Cooper's testimony to convict him. To this, Jackson argues that Cooper's testimony was unreliable, in part, because she received a deal from the State to reduce her sentence as Jackson's codefendant for the

death of Miletello.  Jackson further argues that Cooper's testimony was unreliable because Cooper could not provide reliable testimony regarding anything that could have occurred in Miletello's home, let alone testify that Jackson hurt Lolley.

Jackon highlights that Cooper only testified that after she dropped Jackson off, she went to her apartment and stayed there with Miletello until Jackson returned.  Jackson argues that because Cooper was not present, she could not verify that Jackson went into Miletello's home, that someone else was already in the home, or that Lolley was not already dead when Jackson was dropped off.  Jackson asserts that he never indicated that he hurt Lolley and Cooper only assumed he hurt Lolley because of a simple statement in which he told Cooper, "s**t went wrong" when he returned to her apartment.

Likewise, for count 2, Miletello's murder, Jackson argues that none of the evidence recovered was linked to him, and his conviction was based on Cooper's testimony, and Facebook messages sent between himself, Cooper, and Miletello.  Jackson highlights that Cooper testified that after Jackson got back to her apartment, he stated he planned to kill Miletello, and she took the pair to test fire a gun.  He notes that Cooper specifically stated that it was dark outside, and she remained in the vehicle while the two men got out. Jackson argues that, once again, Cooper was not present when the alleged act occurred, and although Cooper claimed to have heard six gunshots, she did not see who fired the shots.  Regardless, Jackson argues that the casings at the scene were never linked to him, and there was no evidence aside from Cooper's testimony that he was ever in the vehicle when Cooper ran over Miletello's body.

Accordingly, Jackson argues that his convictions should be vacated. We disagree.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L.Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from circumstantial evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Norman*, 51,258 (La. App. 2 Cir. 5/17/17), 222 So. 3d 96, *writ denied*, 17-1152 (La. 4/20/18), 240 So. 3d 926.

Direct evidence provides proof of the existence of a fact; for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So.

2d 1154 (La. 1985); *State v. Baker*, 49,175 (La. App. 2 Cir. 8/27/14), 148 So. 3d 217. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127.

For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Christopher*, 50,943 (La. App. 2 Cir. 11/16/16), 209 So. 3d 255, *writ denied*, 16-2187 (La. 9/6/17), 224 So. 3d 985. The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417; *State v. Alexander*, 53,449, (La. App. 2 Cir. 11/18/20), 306 So. 3d 594, 598, *writ denied*, 20-01449 (La. 6/22/22), 339 So. 3d 642; *State v. Garner*, 45,474 (La. App. 2 Cir. 8/18/10), 47 So. 3d 584.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L.Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Green*, 49,741 (La. App. 2 Cir. 4/15/15), 164 So. 3d 331. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

11

Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2997 (La. 6/27/03), 847 So. 2d 1255. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Elkins*, 48,972 (La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 153 So. 3d 438.

In this case, Jackson was convicted of two counts of second degree murder, which is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1).

The crux of Jackson's argument on appeal is that Cooper's testimony, in lieu of other physical evidence, was insufficient to convict him for the murders of either Miletello or Lolley. However, in *State v. Dorsey*, 10-0216 (La. 9/7/11), 74 So.3d 603, *cert. denied*, 566 U.S. 930, 132 S. Ct. 1859, 182 L.Ed. 2d 658 (2012), the Supreme Court held that:

> [a] victim's or witness's testimony alone is usually sufficient to support the verdict
>
> . . .
>
> A jury may also convict upon a co-defendant's uncorroborated testimony. An accomplice is qualified to testify against a co-perpetrator even if the prosecution offers him inducements to testify and such inducements would merely affect the witness's credibility. A conviction can even be based on the uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided the testimony is not incredible or otherwise insubstantial on its face. Testimony should not be declared incredible as a matter of law unless it asserts facts the witness physically could not have observed or events that could not have occurred under the law of nature. (citations omitted).

12

With respect to Lolley, this Court acknowledges that the knife used to stab Lolley was not recovered, and no DNA was found at the scene which was directly linked to Jackson. However, Cooper's testimony specifically places Jackson at the scene of the crime, reflects Jackson's motive and plan to enter Miletello's home where Lolley also lived, and details Jackson's plan to rob Miletello's home.

Specifically, Facebook messages between Jackson and Miletello reflected that Jackson wanted to purchase a gun from Miletello, but Jackson was frustrated with Miletello for either not having or offering to sell the type of gun Jackson wanted. Cooper testified that Miletello sent her pictures of an array of guns he had lined on his bed, which included AR-15s. Cooper stated that she sent those pictures to Jackson who expressed he wanted the guns seen in the pictures. Cooper testified that on May 7, 2019, she and Jackson planned to have Miletello meet with Cooper at her apartment while Cooper dropped Jackson off at Miletello's home so he could "check some s**t out."

Cooper explained this meant Jackson planned to rob Miletello. Cooper stated that when Jackson returned to her apartment, he stated that "s**t went wrong," washed his hands, and stated that he would have to kill Miletello. Further, Cooper testified Jackson placed a large gun bag in her closet which would have been able to fit the AR-15s seen in the pictures Miletello sent. Although Jackson argues that the guns were never recovered, Cooper specifically testified that Jackson disposed of the same gun bag Jackson placed in her closet, at his mother's home in Shreveport.

Further, while Cooper was not present in Miletello's home when she dropped Jackson off, a reasonable jury could have believed, as the State posited that Jackson planned to rob Miletello, which led to Lolley's and Miletello's deaths. Cooper confirmed that Jackson went into Miletello's home and stole the guns as planned as evidenced by the gun bag, but his plan went awry when he encountered Lolley, as confirmed by Cooper's testimony that Jackson said, "s**t went wrong," in relation to his plan, and that as a result, he planned to kill Miletello because he killed Lolley.

Moreover, there is nothing to suggest that Cooper's testimony was implausible, let alone incredible, given she knew about and participated in Jackson's plan, was able to place him at the scene of the crime, confirmed Jackson was present in the home, and he stole Miletello's guns as evidenced by gun bag Cooper observed. The jury was able to assess Cooper's credibility and more than reasonably determined Jackson stabbed Lolley.

Next, regarding Miletello's murder, this Court again notes that while Cooper did not personally observe Jackson shoot Miletello, she specifically stated that Jackson told her he would have to kill Miletello, and Jackson had placed a gun in the trunk of her vehicle. Thereafter, Jackson asked Cooper to take him and Miletello to test fire a gun, wherein Cooper testified that she drove the two men out to Stubbs Vinson Road.

Cooper stated that although it was dark, she heard Jackson open the trunk, saw the two men walk off, and heard six gunshots before only Jackson returned to the vehicle, tossed a phone out of the window, and she accidentally ran over Miletello's body. Cooper also stated that after this, she and Jackson agreed to delete all their messages with Miletello. Cooper's testimony of the events leading to Miletello's death was then confirmed by

14

Dr. Peretti's testimony that Miletello was fatally shot six times before his body was run over. Further, Inv. Foster confirmed that both Jackson and Cooper deleted all messages with Miletello after Miletello was murdered.

In viewing the evidence in the light most favorable to the prosecution, and giving full deference to the jury's ability to give weight to and assess the credibility of witness testimony, we find that any rational trier of fact could have found that Jackson killed both Lolley during the robbery he planned with Cooper, and after killing Lolley, then killed Miletello to cover his actions. Because the jury found Cooper's testimony, in light of Inv. Foster's and Dr. Peretti's testimonies and the Facebook messages, credible in returning a guilty verdict, we find there was sufficient evidence for the jury to convict Jackson as charged.

## CONCLUSION

For the above reasons, Jackson's convictions are affirmed.

**AFFIRMED.**